**REDACTED**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR ISSUANCE OF
### (1) CRIMINAL COMPLAINT;
### (2) ARREST WARRANT; and
### (3) SEARCH & SEIZURE WARRANT.

Your affiant, Special Agent Phillip B. Gautney, being duly sworn and deposed, states as follows:

## INTRODUCTION

1. Your affiant is currently assigned to the Violent Crime and Major Offensive (VCMO) Squad in the Norfolk Federal Bureau of Investigation (FBI) Field Office. Your affiant has been assigned to the Norfolk Field Office located in the Eastern District of Virginia (EDVA), where your affiant's primary duties have been, but are not limited to, violent crimes, gangs, and narcotics trafficking. As a Special Agent, your affiant is responsible for investigating various forms of gangs and violent crimes. Based on training and experience, your affiant is familiar with investigative tactics, methods, and techniques. As a result of training and experience as a Special Agent for the FBI, your affiant is familiar with the federal laws and statutes.

2. Your affidavit will show probable cause to believe that between approximately 2011 and continuing thereafter until April 2016 within the EDVA, and elsewhere, the defendant, CARLOS BROWN, aka "Los," (hereinafter referred to as BROWN), committed the following offenses against the United States:

   i. Distribution of Heroin Resulting in Death in violation of Title 21 §§ 841(a)(1) and (b)(1)(C);

   ii. Distribution of Heroin Resulting in Serious Bodily Harm in violation of Title 21 §§ 841(a)(1) and (b)(1)(C);

1

iii. Distribution of Fentanyl in violation of Title 21 § 841(a)(1) and (b)(1)(C); and

iv. Distribution of more than 1,000 grams of heroin in violation of Title 21 U.S.C. §§846 and 841(a)(1) and (b)(1)(A)(i).

## SEARCH LOCATION

3. Your affiant also makes this affidavit in support of an application for a search warrant for the following location within the EDVA: The registered address of BROWN, located at ███████████████████████████, Portsmouth, Virginia 23704 (hereinafter referred to as LOCATION 1).

## PROPERTY TO BE SEIZED & AUTHORITY FOR SEIZURE WARRANT

4. Your affiant also makes this affidavit in support of an application for a seizure warrant for the following property, which is located in the EDVA: a black 2002 Dodge Durango, bearing Virginia license plate ██████, VIN ████████████, which is registered to BROWN at LOCATION 1 (hereinafter referred to as VEHICLE 1). This request for seizure warrants is made in relation to the offenses cited in paragraph two above. For the reasons set forth in this affidavit, the aforementioned offenses make the property listed herein subject to civil seizure under 21 U.S.C. § 881(b), and criminal seizure under 21 U.S.C. § 853(f). The same property is subject to civil forfeiture under 21 U.S.C. §§ 881(a)(4) and (a)(7), and criminal forfeiture under 21 U.S.C. § 853(a).

## EXPERIENCE AND TRAINING OF AFFIANT

5. Your affiant is currently assigned to the Violent Crime Squad in the Norfolk FBI Field Office. Your affiant has been a Special Agent with the FBI since January 2010. Over the course of the past five years, your affiant has been the principal investigator in federal investigations

involving public corruption, kidnappings, child pornography, narcotics trafficking and violent gang/criminal enterprise organizations. The violent gang/criminal enterprise investigations have focused in part on drug trafficking involving the unlawful transportation and distribution of controlled substances, and violent acts that are used by gang members to intimidate, control and facilitate schemes for the gang to obtain money and territory. Through experience and training, your affiant has become familiar with the methods and schemes employed by gang members to obtain and distribute controlled substances. Your affiant is also familiar with, and has utilized, a wide variety of investigative techniques, including but not limited to, the development of cooperating sources, source debriefings, physical surveillance, electronic surveillance, trash pulls controlled purchases, telephone toll record analysis, pen registers, issuing grand jury subpoenas and search warrants. Your affiant has conducted and assisted investigations focused on the unlawful possession, possession with intent to distribute, and distribution of controlled substances, and associated conspiracies, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, to include search and seizure, surveillance, intelligence, arrests, interviews, interrogations, Title III wire intercepts, and drug interdiction.

## EXPERIENCE AND TRAINING OF THE INVESTIGATIVE TEAM

6. The investigative team consists of members from the Norfolk FBI Office, Virginia State Police (VSP) and Chesapeake Police Department (CPD). The respective agents and officers assigned to this investigation are hereinafter referred to as "the investigative team."

7. Collectively, your affiant and other members of the investigative team have participated in the preparation and execution of numerous affidavits for search and/or seizure warrants in connection with drug and illegal firearm possession, distribution and trafficking investigations. These warrants involved the search of suspects' residences, vehicles, electronic

devices and stash houses. Materials searched for and recovered at these locations included narcotics, firearms, ammunition, drug paraphernalia, electronic devices, U. S. currency; and records pertaining to the purchase, sale, and distribution of drugs and firearms.

## TECHNIQUES USED BY DRUG TRAFFICKERS

8. Based on the combined training and experience of members of the investigative team and their participation in other investigations involving federal violations of the Drug Control Act and related offenses, your affiant knows:

    a. That drug traffickers often purchase or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by law enforcement officers;

    b. That even though these assets are in names of individuals other than a targeted drug trafficker, the drug trafficker actually owns and continues to use these assets and exercise dominion and control over them;

    c. That drug traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug businesses;

    d. That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline instruments, and other papers relating to the transportation, ordering, purchase, sale, and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

    e. That it is common for drug traffickers to secrete incriminating materials, proceeds of drug sales, and records of drug transactions, in secure locations within their residences, their businesses, or other locations, such as self-storage units over which they maintain dominion and control, for ready access, or to conceal these items from law enforcement authorities;

4

f. That it is common for persons involved in drug trafficking to maintain evidence relating to their obtaining, secreting, transferring and concealing of drugs, large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, wire transfers, money drafts, letters of credit, safe deposit box keys, money wrappers, and other evidence of financial transactions. These items are maintained by the drug traffickers within their residences, their businesses or other locations such as self-storage units over which they maintain dominion and control, or are buried or concealed within the grounds thereof;

g. That drug traffickers amass proceeds from the sale of drugs, and they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize numerous methods and services, including but not limited to: domestic and international banks and their attendant services, cashier's checks, money orders, money drafts, letters of credit, attorneys, accountants, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

h. That the Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed; in particular, drug trafficking;

i. That it is common for individuals who are involved in illegal activities also to evade their individual income taxes by understating their income or not filing individual income tax returns at all;

j. That drug traffickers commonly maintain addresses or telephone numbers in books, papers, pocket telephone cards, wrist watches, and mobile devices, which reflect names, addresses, and telephone numbers of their associates in the drug trafficking organization;

k. That it is common for drug traffickers to maintain photographs and electronic images of themselves with their associates of the drug trafficking organization, drugs, guns, and assets, including large amounts of U.S. currency and vehicle;

l. That drug traffickers own and maintain at their residences and businesses, facsimile machines, personal desktop and laptop computers and other similar and related devices, including monitors, printers, keyboards, thumb drives, hard disks, CD-ROMs, hand-held mobile computing devices, mobile phones, operating manuals, and the like, that are used in the commission of criminal offenses or that contain evidence of criminal offenses, including, for example, programs to allow users to manage and to track their financial portfolios and generate, transfer, count, record, and/or store the information listed in the above paragraphs; and

m. That it is common for drug dealers to use multiple bank accounts to conceal the nature and circumstances of deposits of cash generated by drug trafficking, and that it is also common for drug traffickers to maintain financial records related to those multiple accounts to allow them to track and manage the money they are laundering from the illegal drug trafficking activity.

## SOURCES OF PROBABLE CAUSE

9. The facts comprising the basis for probable cause in this affidavit are derived from the following sources:

a. A review of investigative reports and interviews with law enforcement officers who have investigated BROWN;

b. Controlled purchases of controlled substances;

c. Physical and electronic surveillance of the suspect conducted by members of the investigative team; and

d. Independent investigation by the investigative team including, but not limited to, a review of government records from the National Crime Information Center; Lexis-Nexis; and other databases; and review and analysis of phone records and subscriber information.

## BASIS FOR FACTS CONTAINED IN AFFIDAVIT

10. Since this affidavit is being submitted only for the limited purpose of securing authorization for a criminal complaint, search warrant, and arrest warrant, your affiant has not included each and every fact known to the investigative team concerning this investigation. Rather, your affiant has set forth only those facts that are believed to be necessary to establish probable cause for the complaint and for each of the warrants sought.

11. Your affiant has personally participated in the investigation of the offenses described in this affidavit. In addition, as a result of a review of reports made by other members of the investigative team, your affiant is familiar with the circumstances of this investigation. On the basis of this familiarity, your affiant has reviewed and determined the information to be accurate and reliable, and your affiant alleges the following:

## FACTS AND CIRCUMSTANCES

12. In November 2015, a joint investigation into the death of R.W. and the drug distribution activities of BROWN was initiated by the FBI, VSP, and CPD. Over the course of approximately the next six months, members of the investigative team began gathering various sources of information including Confidential Human Source (CHS) debriefs, as well as arrest and police reports related to the drug distribution activities of BROWN. This information led members of the investigative team to suspect BROWN was distributing significant quantities of heroin into the EDVA for sale and distribution. To corroborate these debriefs, the investigative

7

team cultivated human sources and controlled purchases of illegal narcotics from BROWN utilizing cooperating CHS's, undercover agents, and physical and electronic surveillance.

13. On November 21, 2015, members of CPD were dispatched to the ▇ block of ▇▇▇▇▇▇▇▇▇▇, Chesapeake, Virginia 23322, in reference to a suspected heroin overdose. Paramedic David Billings pronounced the victim, R.W., deceased at approximately 8:27 a.m. The victim was found deceased in his bedroom. Multiple syringes and two clear plastic capsules were located near R.W.'s body. One capsule appeared to be empty. The second appeared to contain a white powdery substance. Based on training and experience, members of the investigative team recognized these items to be consistent with heroin use and suspected the white powdery substance to be heroin. Members of the investigative team responded to the scene, collected the evidence and submitted it to the state laboratory for analysis.

14. During the course of the investigation, a confidential human source (CHS-1) provided the following information to members of the investigative team concerning the death of R.W. and the drug distribution activities of BROWN. CHS-1 and R.W. were friends for approximately five years. During that time, CHS-1 and R.W. frequently used heroin together. CHS-1 knew R.W. had been purchasing heroin from BROWN for approximately three years. As a result of being heroin users and close friends, R.W. introduced CHS-1 to BROWN as a source of supply of heroin in May 2015.

15. On Wednesday, November 18, 2015, CHS-1 and CHS-2 contacted BROWN to purchase 11 capsules of heroin. CHS-1 and CHS-2 met BROWN and exchanged U.S. currency, $20.00 per capsule, for heroin. CHS-1 stated BROWN described the heroin as a "missile." On this day, CHS-1 and CHS-2 were both utilizing the recently purchased heroin from BROWN while in CHS-2's vehicle. Shortly after intravenously using the recently purchased heroin from

BROWN, CHS-1's body went into an overdose state. At some point during the overdose, the vehicle CHS-1 and CHS-2 were occupying was stopped by a Portsmouth Police Department (PPD) Uniform Officer for a minor traffic violation. The driver of the vehicle, CHS-2, advised the Officer that CHS-1 was overdosing on heroin. CHS-1 was unresponsive at this time. CHS-1 was transported to Maryview Medical Center for treatment by Emergency Medical Services (EMS). During the transport, EMS administered Narcan (an opiate antidote) to CHS-1. CHS-1's medical records corroborated his/her diagnosis was a "Heroin Overdose." CHS-1 was questioned by PPD personnel on that date and he/she was subsequently charged with possession of heroin. CHS-1 was released from the hospital the next day.

16. On Thursday, November 19, 2015, BROWN contacted CHS-1 and asked if he/she had overdosed on the heroin that he (BROWN) had sold him/her. CHS-1 did not advise BROWN of the overdose. BROWN told CHS-1 that three or four of his clients had overdosed from the heroin and customers seemed eager to acquire more of his heroin as result of its high potency. BROWN also told CHS-1 that he would try to get more heroin from that batch from his supplier.

17. On Friday, November 20, 2015, R.W. gave CHS-1 money to purchase heroin from BROWN. R.W. requested that CHS-1 purchase the heroin from BROWN while he (R.W.) was at work. At approximately 2:00 p.m., CHS-1 met BROWN in a public parking lot in Portsmouth, Virginia and purchased seven capsules of heroin. Five capsules were for R.W. and two were for CHS-1 for purchasing the heroin on R.W.'s behalf. CHS-1 returned to R.W.'s place of work and handed him the five capsules of heroin. R.W. took a break from work and used one of the heroin capsules. CHS-1 warned R.W. about the potency of the heroin as a result of his/her previous overdose (See Paragraph 14). At approximately 4:30 p.m. to 5:00 p.m. R.W.

9

called CHS-1 and invited him/her to come to his (R.W.'s) residence. CHS-1 arrived at approximately 5:30 p.m. and left shortly after midnight. Between that time R.W. and CHS-1 each used two heroin capsules at R.W.'s residence, which left R.W. with two capsules remaining. On Saturday, November 21, 2015, R.W. was found deceased in his (R.W.'s) bedroom with one capsule remaining.

18. On November 21, 2015, after the news of R.W.'s death had spread, BROWN telephonically contacted CHS-1 and asked if the news about R.W.'s death was true. CHS-1 explained R.W. had overdosed on heroin purchased from BROWN and was dead. BROWN offered to "take care" of CHS-1. CHS-1 understood this to mean BROWN would provide him/her heroin for free. Later on the same date, CHS-1 proceeded to LOCATION 1 and met with BROWN. BROWN provided CHS-1 four capsules of heroin for free.

19. From approximately May 2015 through November 2015, CHS-1 stated he/she purchased two to five capsules of heroin from BROWN on a daily basis, paying $20.00 per capsule. CHS-1 advised while this was well above the market cost for heroin in the EDVA, he/she was willing to pay more for BROWN's product as a result of the consistent high potency of the narcotics. CHS-1 and CHS-2 each confirmed the quality of the heroin BROWN distributed exceeded that of other distributors. CHS-1 estimated that he/she purchased heroin from BROWN, just outside the doorway of LOCATION 1, approximately 100 times during this timeframe. CHS-1 stated he/she purchased heroin from BROWN on approximately 20 occasions inside of LOCATION 1. In or about September 2015, CHS-1 observed BROWN inside LOCATION 1 with a large amount of heroin. CHS-1 estimated it to be one half pound to one pound (224 grams to 453 grams) of heroin. On one occasion, BROWN showed CHS-1 inside

LOCATION 1 how he prepared heroin for distribution by scooping a capsule straight from the block of heroin.

20. During the course of the investigation, CHS-4 provided the following information to members of the investigative team concerning the drug distribution activities of BROWN. In February 2016, CHS-4 observed BROWN with approximately 100 capsules (10 grams) of heroin inside LOCATION 1. CHS-4 observed BROWN exchange heroin for U.S. currency from six to seven individuals within a 30-minute timeframe while inside LOCATION 1. Also, CHS-4 observed BROWN with a handgun on his person while inside LOCATION 1. CHS-4 stated BROWN removed the firearm from his waist band and placed it on a table. CHS-4 stated BROWN routinely carries a firearm on his person.

21. CHS-4 stated BROWN described the heroin he was distributing as a "missile" and he (BROWN) has "got that killa," which CHS-4 understood to mean that his (BROWN's) heroin is good quality and has resulted in the death of an individual(s) in the past.

22. CHS-4 estimated he/she observed BROWN with approximately 100 capsules of heroin on his person on at least five occasions since January 2016. CHS-4 estimated he/she has observed Brown possess and sell approximately 1.5 kilograms (1,500 grams) of heroin over the past five years. Additionally, CHS-4 estimated he/she has observed Brown distribute approximately seven ounces (196 grams) of crack cocaine over the past five years. CHS-4 advised BROWN most commonly sells heroin. CHS-4 stated BROWN frequently conceals narcotics in his (BROWN's) prosthetic leg to avoid detection by law enforcement.

23. To date, members of the investigative team have interviewed multiple individuals familiar with BROWN's involvement in the distribution of controlled substances. Each of these individuals made statements against their penal interests. Based on information from the sources

that members of the investigative team have developed thus far, BROWN is responsible for distributing a minimum of 1.7 kilograms of heroin in the EDVA between 2011 and the writing of this affidavit.

## PROACTIVE DRUG INVESTIGATION

24. In November 2015, based on the aforementioned death of R.W. and suspicions of BROWN's involvement in the distribution of controlled substances in the EDVA, members of the investigative team began to investigate BROWN's habits and routines. Multiple investigative techniques were applied (See paragraph 8). These efforts confirmed BROWN's registered address to be LOCATION 1. The Virginia Department of Motor Vehicles (DMV) confirmed that BROWN's residence is LOCATION 1.

25. In November 2015, at the direction of members of the investigative team, CHS-1 began completing the first of four controlled purchases of heroin from BROWN. During these operations, members of the investigative team observed BROWN to have unique physical features. These features included a limp and a noticeable prosthetic leg. BROWN utilized multiple vehicles to deliver and coordinate the controlled purchases. Each controlled purchase was completed per the policy and procedure outlined by the employing agencies of members of the investigative team. These policies require any CHS to be thoroughly searched prior to and after a controlled purchase. This is to insure CHS's do not possess contraband, weapons, etc. All transactions required the exchange of U.S. currency (which belonged to an involved investigative agency) from CHS-1 to BROWN for controlled substances. Each controlled purchase was coordinated by contacting BROWN at the cellular device assigned ▇▇▇▇ and ▇▇▇▇. As the investigation progressed, the involvement of an undercover agent steadily increased. The law enforcement team obtained recorded calls with BROWN and

utilized audio and video recordings for the controlled purchases. These controlled purchases resulted in the seizure of heroin and fentanyl, which is a Schedule II controlled substance. When combined with heroin, fentanyl can have lethal consequences. Narcotics seized during two of the four controlled purchases were field tested and yielded positive results for heroin. They were later sent to a laboratory for chemical analysis, which confirmed the presence of heroin. Narcotics seized during the additional two purchases were field tested and yielded negative results for heroin, but were further analyzed by the Virginia State Laboratory and yielded positive results for heroin and fentanyl.

26. On November 24, 2015, at the direction of members of the investigative team, CHS-1 and CHS-2 completed a controlled purchase of heroin from BROWN. The controlled purchase was coordinated as a result of CHS-1 contacting BROWN via telephone on the cellular device assigned ▇▇▇▇▇▇▇▇. BROWN agreed to distribute CHS-1 heroin in exchange for a specified amount of U. S. currency. BROWN and CHS-1 agreed to complete the transaction at a location in Portsmouth, Virginia, directly across the street from LOCATION 1. Members of the investigative team completed surveillance at the buy location as CHS-1 and CHS-2 drove to the aforementioned meeting location. CHS-1 completed the controlled purchase from one of BROWN's co-conspirators, an unknown female. Members of the investigative team observed the female come from the vicinity of LOCATION 1. CHS-1 provided the unknown female U.S. currency in exchange for heroin. Following the transaction, the unknown female departed the area. A member of the investigative team immediately took custody of the suspected heroin.

27. On February 3, 2016, at the direction of members of the investigative team, CHS-1, CHS-2, and a member of the investigative team, operating in an undercover capacity (hereinafter referred to as UC-1), completed a controlled purchase of heroin from BROWN. The

controlled purchase was coordinated as a result of CHS-1 contacting BROWN via telephone on the cellular device assigned ▪▪▪▪▪▪▪▪. BROWN agreed to distribute CHS-1 heroin in exchange for a specified amount of U.S. currency. BROWN and CHS-1 agreed to complete the transaction at a location in Portsmouth, Virginia near the area of Effingham Street and Elm Street. CHS-1 made contact with BROWN, via cellular telephone, and BROWN instructed CHS-1 turn by turn on where to proceed. The meeting location was picked by BROWN to be at the intersection of Prentis Avenue and Lincoln Street in Portsmouth, Virginia. BROWN walked up to CHS-1's vehicle and CHS-1 provided BROWN with U.S. currency in exchange for heroin. BROWN left the area after the sale. The transaction was witnessed by CHS-2 and UC-1 inside the vehicle. A member of the investigative team immediately took custody of the suspected heroin, which, after laboratory testing, turned out to be heroin and fentanyl.

28. On February 5, 2016, at the direction of members of the investigative team, CHS-1, CHS-2, and UC-1 completed a controlled purchase of heroin from BROWN. The controlled purchase was coordinated as a result of CHS-1 contacting BROWN via telephone, on the cellular device assigned ▪▪▪▪▪▪▪▪. BROWN agreed to distribute CHS-1 heroin in exchange for a specified amount of U.S. currency. BROWN and CHS-1 agreed to complete the transaction at a location in Portsmouth, Virginia near the area of Effingham Street and Lincoln Street. Shortly after the call was placed by CHS-1, BROWN was observed by members of the investigative team departing LOCATION 1 in a black Dodge Durango bearing Virginia license plate ▪▪▪▪▪▪ (hereinafter referred to as VEHICLE 1). Approximately 10 to 15 minutes later, BROWN was observed parking near the vehicle CHS-1 occupied. CHS-1 approached BROWN's vehicle and CHS-1 provided BROWN U.S. currency in exchange for heroin. The transaction was witnessed by CHS-2 and UC-1 inside the vehicle. A member of investigative team immediately

took custody of the suspected heroin, which after laboratory testing, turned out to be heroin and fentanyl.

29. On February 9, 2016, UC-1 and an additional member of the investigative team, operating in an undercover capacity (hereinafter referred to as UC-2), completed a controlled purchase of heroin from BROWN. UC-1 contacted BROWN via telephone, on the cellular device assigned ███████████. BROWN agreed to distribute UC-1 heroin in exchange for a specified amount of U.S. currency. BROWN and UC-1 agreed to complete the transaction at a location in Portsmouth, Virginia, near the area of Effingham Street and Lincoln Street. UC-1 was assigned to conduct the purchase and UC-2 was assigned as the driver of the vehicle. UC-1 and UC-2 arrived at the predetermined meeting location. UC-1 exited the vehicle and approached BROWN's vehicle. UC-1 provided BROWN U.S. currency in exchange for heroin. During the transaction, BROWN attempted to require UC-1 to use some of the purchased heroin in his (BROWN's) vehicle. Members of the investigative team know this to be a technique utilized by narcotics distributors to avoid detection by law enforcement.

30. To date, members of the investigative team have purchased approximately 2 grams of heroin from BROWN and his co-conspirators.

31. Between April 5, 2016, and the writing of this affidavit, members of the investigative team have completed electronic surveillance (containing historic information) on the cellular device assigned ███████████, which BROWN is known to possess. This investigative technique confirmed the cellular device is frequently located in the direct vicinity of LOCATION 1.

32. On April 13, 2016, members of the investigative team completed a surveillance operation focused on BROWN. Utilizing both electronic and physical surveillance techniques,

15

members of the investigation team observed BROWN for several hours. It was confirmed the cellular device, assigned ███████████, was in his possession. BROWN was observed operating a vehicle and frequently parking in public parking lots for short periods of time. Members of the investigative team know this action to commonly be utilized by narcotics distributors to avoid detection by law enforcement. As a result of intelligence gained during the investigation, members of the investigative team know this to be a distribution technique commonly utilized by BROWN. During this operation, members of the investigative team observed BROWN in the direct vicinity of LOCATION 1 multiple times.

## SEARCH WARRANT LOCATION

███████████████████████████ **Portsmouth, Virginia 23704 (LOCATION 1)**

33. The residence at ███████████████████ Portsmouth, Virginia 23704 (LOCATION 1) is suspected of being utilized to store, sell, and distribute controlled substances. This location has been shown through this investigation as the registered residence of BROWN's vehicle. The following probable cause has been developed through physical surveillance, electronic surveillance, CHS interviews, as well as overt and criminal acts committed by BROWN after departing this location.

34. LOCATION 1 is currently listed as BROWN's mailing/registered address within Department of Motor Vehicle (DMV) database.

35. Multiple CHS's reported knowledge of BROWN residing at, storing, and selling heroin at LOCATION 1. Two CHS's were inside this location with BROWN and observes him with heroin and a firearm at LOCATION 1.

36. On November 24, 2015, members of the investigation team contacted BROWN to coordinate a controlled purchase of heroin. BROWN instructed CHS-1 to proceed to the vicinity

of LOCATION 1 to complete the transaction. During the operation, members of the investigative team, utilizing physical surveillance, observed a female known to work with BROWN, come from the vicinity of LOCATION 1 and deliver heroin to CHS-1.

37. In February 2016, members of the investigation team completed a controlled purchase of heroin from BROWN. During the operation, members of the investigative team, utilizing physical surveillance, observed a subject matching the description of BROWN walk from LOCATION 1 and enter VEHICLE 1, a black Dodge Durango bearing Virginia license plate ▇▇▇▇▇. The subject proceeded to a predetermined meeting location, met with CHS-1, and completed the narcotics transaction. CHS-1 identified the male as BROWN. UC-1 witnessed the transaction and identified the male as BROWN. A Virginia Query of Motor Vehicles (QVN) indicated that VEHICLE 1, a black Dodge Durango bearing Virginia license plate ▇▇▇▇▇, is registered to BROWN at LOCATION 1.

38. Members of the investigative team completed electronic surveillance on the cellular device assigned ▇▇▇▇▇, which BROWN is known to possess. This investigative technique confirmed this cellular device is frequently located in the direct vicinity of LOCATION 1, as recently as April 13, 2016.

39. On April 13, 2016, members of the investigative team completed a surveillance operation focused on BROWN. Electronic and physical surveillance confirmed the cellular device, assigned ▇▇▇▇▇ was in BROWN's possession. During this operation, BROWN was observed in the direct vicinity of LOCATION 1 multiple times.

## VEHICLE 1: Dodge Durango, Bearing Virginia license plate ███████, VIN ███████

40. VEHICLE 1 is a black 2002 Dodge Durango, bearing Virginia license plate ███████, VIN ███████████████. The vehicle is suspected of being utilized to store, sell, and distribute controlled substances. This vehicle has been shown through this investigation as consistently being used by BROWN to deliver and distribute controlled substances.

   a. VEHICLE 1 is currently registered to BROWN at LOCATION 1.

   b. Physical surveillance by members of the investigative team confirmed BROWN frequently operates VEHICLE 1.

   c. BROWN utilized VEHICLE 1 to deliver controlled substances during one of the four controlled purchases completed by members of the investigative team. During one of the controlled purchases, CHS-1 purchased heroin from BROWN while BROWN was inside VEHICLE 1.

## CONCLUSION

41. The information contained herein describes a nexus of drug distribution activity linked to BROWN. Historical interviews of CHS's, described above, establish that BROWN is responsible for distributing a minimum of 1.7 kilograms of heroin between 2011 and the writing of this affidavit. To corroborate information obtained from multiple sources, members of the investigative team utilized confidential sources to purchase heroin from BROWN on three occasions. Two of these purchases were made in the presence of a member of the investigative team operating in an undercover capacity. To date, members of the investigative team have purchased approximately 2 grams of heroin from BROWN. Based upon the information and evidence set forth above, your affiant respectfully submits that there is probable cause to believe

that BROWN and others, some of whom are not yet known or fully identified, have committed, are committing, and will continue to commit the offenses described in paragraph 2 above.

42. Your affiant further believes that there is probable cause that LOCATION 1, which is the documented registered residence and primary residence of BROWN, is involved in an ongoing criminal conspiracy as is VEHICLE 1, which BROWN has repeatedly utilized to deliver illegal narcotics to members of the investigative team. LOCATION 1 is more particularly described in Attachment A, and suspected to contain the items further described in Attachment B. Therefore, I respectfully request the issuance of a search warrant for LOCATION 1 (including any vehicle parked immediately in front or in back of LOCATION 1) and VEHICLE 1.

43. Your affiant further believes that there is probable cause that the property listed in the "Property to Be Seized" section of this affidavit is subject to seizure and forfeiture for the reasons set out in the "Authority for Seizure Warrants" section of this affidavit. Specifically, VEHICLE 1 is subject to forfeiture because it is believed to be proceeds of drug trafficking and distribution, and facilitating property for drug trafficking and distribution. Therefore, I respectfully request the issuance of a seizure warrant for VEHICLE 1 as a restraining order will not suffice since motor vehicles are quite easy to move and hide.

FURTHER YOUR AFFIANT SAYETH NOT.

                                                                       Special Agent Phillip B. Gautney
                                                                       Federal Bureau of Investigation

Sworn and subscribed to before me
On this the day ___ of April, 2016

                                                                       United States Magistrate Judge
                                                                       Norfolk, Virginia